# IN THE SUPREME COURT OF IOWA

No. 14–0357

Filed April 1, 2016

**IN THE INTEREST OF J.C., Minor Child**

**J.C.**,
Minor Child,

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Christine Dalton, Judge.

A youth adjudicated as a delinquent seeks further review of a court of appeals decision affirming the adjudication. **DECISION OF COURT OF APPEALS AND JUVENILE COURT JUDGMENT AFFIRMED.**

Timothy J. Tupper, Davenport, for appellant.

Thomas J. Miller, Attorney General, Bruce L. Kempkes, Assistant Attorney General, Michael J. Walton, County Attorney, and Elizabeth J. Cervantes, Assistant County Attorney, for appellee.

**MANSFIELD, Justice.**

This appeal from an adjudication of delinquency requires us to determine whether a violation of the Confrontation Clause occurred when the juvenile court admitted out-of-court statements of a four-year-old child victim. The child made some of the statements during a medical assessment performed by a physician; others were made in the course of a recorded interview conducted by a forensic interviewer. Both the physician and the interviewer testified at the hearing.

Applying recent authority of the United States Supreme Court, we find that admission of the physician's testimony and report did not violate the Confrontation Clause. We also conclude that any error in admission of the forensic interviewer's testimony was harmless beyond a reasonable doubt in light of other overwhelming evidence that the respondent committed the charged conduct. For these reasons, we affirm the judgment of the juvenile court and the decision of the court of appeals.

## I. Facts and Procedural Background.

On July 2, 2013, twelve-year-old J.C. visited the home of his friend K.W. An extended family lived in the home, including K.W.'s sister E.W., K.W.'s brother I.W., and their four-year-old niece A.W.

That afternoon a number of the children were playing outside. J.C. tried to take pictures with a cellphone of E.W.'s chest and tried to touch her. J.C. also attempted to show photos of his penis to E.W. On a previous occasion, J.C. had written a note to E.W. asking to have sex.

After dinner, I.W. walked into an upstairs bedroom unannounced. He saw J.C. pulling down A.W.'s underwear and saying, "It's time to go to sleep." A.W. was lying on her back; J.C. was on his knees over her. The underwear was halfway pulled down when I.W. arrived. I.W. yelled at

J.C. and pulled him off of A.W.  J.C. denied that anything was going on, turned red, and ran out of the house.

Meanwhile, E.W. and her friend M.M. had been downstairs.  M.M. heard A.W. scream.  She and E.W. ran upstairs and entered the bedroom.  I.W. was already in the room.  According to M.M., J.C. had A.W. pinned on the bed and was on top of her.  J.C. was taking off A.W.'s clothing, and A.W.'s shirt was already on the floor.  J.C. soon left the house.

E.W. also recalled hearing commotion and going upstairs with M.M.  She arrived to see J.C. on the bed with A.W. and his arm on her.  To E.W.'s recollection, A.W. was still dressed.

The two older girls—E.W. and M.M.—grabbed A.W. and brought her downstairs to her mother who was doing chores at the time.  The mother called the police and filed a report.  The police later directed A.W.'s parents to the Child Protection Response Center for interviewing.

The police also obtained K.W.'s cellphone, which J.C. had been using that day.  The cellphone was found to contain photos of J.C.'s penis, a video of J.C. masturbating, and a video taken by J.C. of K.W. with J.C.'s voiceover stating that K.W. was going to suck his penis that evening.

A.W. does not speak very clearly.  A.W. is in speech therapy and, according to A.W.'s mother, talking to her is like talking to a two-year-old.

On July 10, A.W. was brought to the Child Protection Response Center by her parents.  At that time A.W. was interviewed by Michele Mattox—a forensic interviewer with the Child Protection Response Center and a former twenty-five-year employee of the Iowa Department of Human Services.  Mattox had a referral sheet that said, "Rule out sex

abuse by older child . . . ." The interview was recorded on DVD, and Mattox also prepared a report. Mattox recalled that A.W. "had a definite speech and language problem and delay." In the interview, A.W. said that J.C. had touched her "pee" and that her clothes were off and J.C.'s were on. Law enforcement observed the interview.[1]

Additionally, Dr. Barbara Harre, a physician and the medical director of the Child Protection Response Center, saw A.W. on July 31. Her meeting was not recorded, but she dictated a report. Dr. Harre's report explained, "I was asked to complete a medical assessment for [A.W.]" A.W.'s father brought her to the appointment, but Dr. Harre spoke to A.W. alone. No one from law enforcement was present. Dr. Harre took notes and then prepared a report addressed to the assistant county attorney who later prosecuted the case.

Dr. Harre initially reviewed truth–lie concepts and conducted a medical review of A.W.'s systems for any areas of discomfort or signs of illness. Dr. Harre then asked A.W. if she could remember what had happened with her brother's friend when he was at her place. A.W. stated, "Me upstairs. Pulled underpants off." Dr. Harre asked if her underpants came all the way off or down to her knees or something else. A.W. stated, "To knees." In response to a question whether she had been touched, A.W. said, "Touched me boob. One. Two." While saying this, A.W. pointed to both sides of her chest.

Dr. Harre asked if the brother's friend touched her anywhere else. A.W. stated, "Touched back bottom," while pointing to her rear. Dr. Harre asked again if he touched anywhere else. A.W. stated, "Touched

---

[1]At one point, law enforcement sent in questions requesting more detail in one subject area, and those questions were put to A.W. by Mattox and answered.

front bottom." Dr. Harre asked A.W. what he touched her body with, and A.W. said "Wawa," apparently a reference to a dinosaur toy she used to have. Dr. Harre asked if the touching hurt or felt good or tickled or something else. A.W. said, "Hurt." Dr. Harre asked A.W. if anybody else had ever touched her in a way that made her uncomfortable or hurt or something else. A.W. said, "No one else."

After Dr. Harre finished asking these questions, she conducted a full medical exam of A.W., with her father now present at A.W.'s request. Dr. Harre found nothing abnormal in the physical exam. When asked during the medical exam to indicate where she had been touched, A.W. pointed to her front bottom area and her anal area. According to Dr. Harre, it was "moderately" difficult to understand A.W. throughout the interview and exam. Dr. Harre had not received any information concerning Mattox's interview before she saw A.W.

The State filed a delinquency petition and the case proceeded to hearing. A.W.'s mother testified that A.W. would be traumatized by testifying and might not even be able to speak. A psychologist, Catherine Jackson, also testified that the trauma to a child of this age would outweigh any benefit from the testimony. The State did not call A.W. to testify. However, other witnesses for the State included I.W., E.W., M.M., Mattox, and Dr. Harre. J.C. testified on his own behalf and denied assaulting A.W.

J.C. objected to testimony from Mattox and Dr. Harre describing A.W.'s statements on the basis of hearsay and the Confrontation Clause.[2]

---

[2]J.C.'s counsel did not specify whether he was referring to the Confrontation Clause of the United States Constitution or that of the Iowa Constitution.

J.C. also objected to the admission of their written reports and the DVD of Mattox's interview with J.C.

The juvenile court sustained the objections to Mattox's written report and the DVD. The court admitted Dr. Harre's written report. The court also permitted both Dr. Harre and Mattox to testify regarding their interviews of A.W. The court found beyond a reasonable doubt that J.C. committed assault with intent to commit sexual abuse in violation of Iowa Code section 709.11 (2013) and adjudicated J.C. a delinquent child as defined by section 232.2(12).

The court noted that J.C.'s testimony "is inconsistent with A.W.['s] statements to Dr. Harre, and eyewitness accounts by I.W., E.W., M.M., and K.W. who saw A.W. and [J.C.] together. The eyewitness accounts alone are quite persuasive in this case and appear credible due to the differences which are explained by the order they entered the room."

J.C. appealed. He argued that the court erred in admitting certain testimony due to insufficient notice of the witness. He also urged that the court should have excluded any evidence of A.W.'s statements to Dr. Harre and Mattox as violating the Confrontation Clause. Lastly, he argued that evidence of A.W.'s out-of-court statements to Dr. Harre and Mattox should not have been admitted because A.W. was incompetent to testify.

We transferred the case to the court of appeals. The court of appeals affirmed, with one judge on the panel dissenting. J.C. filed an application for further review, which we granted.

## II. Standard of Review.

"We review constitutional questions de novo." *Clarke Cty. Reservoir Comm'n v. Robins*, 862 N.W.2d 166, 171 (Iowa 2015). Our

review of evidentiary claims is for abuse of discretion. *State v. Harrington*, 800 N.W.2d 46, 48 (Iowa 2011).

**III. Analysis.**

On further review, we have discretion to let the court of appeals decision stand as the final decision on an issue. *See State v. Walker*, 856 N.W.2d 179, 184 (Iowa 2014). We do so here with respect to the inadequate notice argument and turn to the remaining issues.

**A. Confrontation Clause—Dr. Harre.** Both the Sixth Amendment of the United States Constitution and article I, section 10 of the Iowa Constitution preserve an accused's right "to be confronted with the witnesses against him." This right of confrontation applies to juvenile delinquency proceedings. *In re Gault*, 387 U.S. 1, 56, 87 S. Ct. 1428, 1459, 18 L. Ed. 2d 527, 562 (1967). Even though J.C.'s appellate brief refers to both the Sixth Amendment and article I, section 10 of the Iowa Constitution, he has not argued for a particular test or standard under the Iowa Constitution. In fact, he has only cited caselaw decided under the United States Constitution. We will therefore follow the approach we took in *State v. Kennedy*:

> "[W]e jealously protect this court's authority to follow an independent approach under our state constitution" for provisions of the Iowa Constitution that are the same or nearly identical to provisions in the United States Constitution. However, in his appellate brief, [the appellant] does not propose a specific test we should apply under article I, section 10 of the Iowa Constitution. Rather he only cites caselaw analyzing the Confrontation Clause under the United States Constitution. Thus, under the facts of this case, we choose not to interpret the Iowa Constitution any differently from the United States Constitution.

846 N.W.2d 517, 522 (Iowa 2014) (first alteration in original) (citation omitted) (quoting *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011)).

Under the Sixth Amendment, the fundamental question we must answer is whether the out-of-court statements were testimonial in nature. *See State v. Bentley,* 739 N.W.2d 296, 298 (Iowa 2007). "If the statements are testimonial, they are inadmissible against [the defendant] at trial; but if they are nontestimonial, the Confrontation Clause does not prevent their admission." *Id.* The burden is on the State to prove by a preponderance of the evidence that a challenged statement is nontestimonial. *State v. Schaer,* 757 N.W.2d 630, 635 (Iowa 2008).

In our determination of what constitutes testimonial evidence, the United States Supreme Court's decision in *Crawford v. Washington* provides direction. 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). As we have said concerning that decision,

> [T]he Court indicated that, at a minimum, there were four types of evidence that met the definition of testimonial: grand jury testimony, preliminary hearing testimony, former trial testimony, and statements resulting from police interrogations. These are the types of evidence with the "closest kinship" to historical "abuses at which the Confrontation Clause was directed."
>
> In addition to these four categories of evidence, the Supreme Court provided three "formulations" to aid courts in determining whether other types of statements are testimonial. The first formulation involved *ex parte* in-court testimony or its functional equivalent where the declarant would reasonably expect the statements to be used at trial and where the defendant was unable to cross-examine the declarant. The second formulation involved formalized testimonial materials such as confessions and depositions. The third and most open-ended formulation included statements made under circumstances that would lead witnesses to objectively believe the statements might be used at trial.

*State v. Shipley,* 757 N.W.2d 228, 235 (Iowa 2008) (citations omitted) ((quoting *Crawford,* 541 U.S. at 51–52, 68, 124 S. Ct. at 1364, 1374, 158 L. Ed. 2d at 193, 203).

Our decision in *Bentley* involved the admissibility of an interview with a ten-year-old girl. 739 N.W.2d at 297. The interview was conducted by a counselor at a child protection center but was arranged by police and DHS personnel and monitored by them through an observation window. *Id.* During the interview, the girl made numerous statements alleging the defendant had sexually abused her. *Id.*

We determined in *Bentley* that use of the interview violated the defendant's Confrontation Clause rights under the Sixth Amendment. *Id.* at 302–03. After carefully reviewing the facts and circumstances, we found that "[t]he extensive involvement of a police officer in the interview leads us to conclude [the girl's] statements were in effect 'taken by [a] police officer[] in the course of [an] interrogation[].'" *Id.* at 299 (last four alterations in original) (quoting *Crawford*, 541 N.W.2d U.S. at 52, 124 S. Ct. at 1364, 158 L. Ed. 2d at 193). Among other things, we emphasized the "close, ongoing relationship" between local law enforcement and the child protection center; the participants' acknowledgment that the interview "served an investigative function for the State"; the disclosure to the girl at the beginning of the interview that police and DHS were listening through the observation window accompanied by the interviewer's explanation that "it's just really important the police know about everything that happened"; and the interviewer's mid-interview consultation with the police and DHS representatives to obtain more questions. *Id.* at 299–300.

Since *Bentley*, we have determined in two cases that statements to medical personnel were not testimonial. In *Schaer*, the victim spoke to treating medical personnel in an emergency room before police arrived, identifying the defendant as her attacker. 757 N.W.2d at 632. We noted that the statements "were not solemn declarations made for the purpose

of proving some fact" or "made under circumstances that would lead an objective person to reasonably believe the statements would be available for use at a later trial." *Id.* at 636. The interview "lack[ed] the indicia of formality" evident in *Bentley*, and there was "no indication in the record of any relationship between the emergency room personnel and law enforcement authorities that would support a finding the medical providers' questioning of [the victim] as to the cause of her injuries was 'a substitute for police interrogation at the station house.' " *Id.* at 637 (quoting *Bentley*, 739 N.W.2d at 299).

Likewise, in *State v. Harper*, we held that a victim's statements to hospital staff that the defendant had raped her, tied her, and set her house on fire were nontestimonial. 770 N.W.2d 316, 322 (Iowa 2009). A doctor had asked the badly burned victim what had happened to her and the victim responded. *Id.* at 323. "The primary purpose of the statements was to assist the physicians in treating her." *Id.*

The question we confront today is whether the statements of a four-year-old to (1) the medical director of the Child Protection Response Center and (2) a forensic interviewer employed by the same organization were testimonial. The statements were made on different visits that occurred on different dates. Law enforcement observed the forensic interview but not the interview conducted by the medical director. It is clear that the police arranged the forensic interview, but less clear how the subsequent meeting with the medical director came about.[3]

---

[3]Dr. Harre testified that A.W. "was referred from the . . . emergency room where she was seen on July 3." Her report, however, indicates that Mattox made the referral following the forensic interview. A police officer, meanwhile, testified that *he* directed A.W.'s parents to Dr. Harre's office so A.W. could be examined. However, A.W.'s mother testified that "the hospital told me to make an appointment with the doctor lady to talk to her and find out if there was anything else going on, and that's what I did."

For additional guidance we turn to the United States Supreme Court's recent decision in *Ohio v. Clark*, 576 U.S. ___, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015). Because of its recent vintage, we have not previously considered or discussed this case. In addition, the court of appeals did not have the benefit of *Clark* when it rendered its decision in this case.

In *Clark*, the defendant was alleged to have physically abused his girlfriend's two young children, one of whom was a three-year-old boy, L.P. *Id.* at ___, 135 S. Ct. at 2177–78, 192 L. Ed. 2d at 312. The boy was found not competent to testify, but his statements to two teachers identifying the defendant as the person who had caused his injuries were admitted by the trial court. *Id.* at ___, 135 S. Ct. at 2178, 192 L. Ed. 2d at 312–13.

On appeal, both the Ohio Court of Appeals and the Ohio Supreme Court found that the admission of the young boy's statements to his teachers violated the Confrontation Clause. *Id.* at ___, 135 S. Ct. at 2178, 192 L. Ed. 2d at 313. Noting that the teachers were under a legal obligation to report child abuse to government authorities, the Ohio Supreme Court found that the statements qualified as testimonial because the primary purpose of the teachers' questioning "was not to deal with an existing emergency but rather to gather evidence potentially relevant to a subsequent criminal prosecution." *Id.* The United States Supreme Court reversed and found no violation. *Id.* at ___, 135 S. Ct. at 2179, 2181, 192 L. Ed. 2d at 313, 315.[4]

---

[4]The reversal was unanimous. *Clark*, 576 U.S. at ___, 135 S. Ct. at 2177, 192 L. Ed. 2d at 311. Justice Alito wrote the opinion for the Court, which a total of six justices joined. *Id.* Justice Scalia wrote a separate opinion concurring in the judgment. Justice Thomas also wrote a separate opinion concurring in the judgment. *Id.* Justice Ginsburg joined Justice Scalia's separate opinion. *Id.*

The Court's opinion first summarized the Court's Confrontation Clause precedents, including *Crawford*, which announced and expounded on the primary-purpose test. *Id.* at ___, 135 S. Ct. at 2179–81, 192 L. Ed. 2d at 313–15. The Court then went on,

> Thus, under our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." But that does not mean that the Confrontation Clause bars every statement that satisfies the "primary purpose" test. We have recognized that the Confrontation Clause does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the time of the founding. Thus, the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause.

*Id.* at ___, 135 S. Ct. at 2180–81, 192 L. Ed. 2d at 315 (citations omitted) (quoting *Michigan v. Bryant*, 562 U.S. 344, 359, 131 S. Ct. 1143, 1155, 179 L. Ed. 2d 93, 107–08 (2011)). In short, the Court made clear that out-of-court statements *could* fail the primary-purpose test and still be admissible notwithstanding the Confrontation Clause.

Applying these principles to Clark's prosecution, the Supreme Court majority first examined the primary-purpose test. It found that the boy's statements "clearly were not made with the primary purpose of creating evidence for Clark's prosecution." *Id.* at ___, 135 S. Ct. at 2181, 192 L. Ed. 2d at 315. Rather, as the Court explained,

> L.P. statements occurred in the context of an ongoing emergency involving suspected child abuse. When L.P's teachers noticed his injuries, they rightly became worried that the 3-year-old was the victim of serious violence. Because the teachers needed to know whether it was safe to release L.P. to his guardian at the end of the day, they needed to determine who might be abusing the child. Thus, the immediate concern was to protect a vulnerable child who needed help.

*Id.* at \_\_\_, 135 S. Ct. at 2181, 192 L. Ed. 2d at 315–16 (footnote omitted). The Court went on,

> There is no indication that the primary purpose of the conversation was to gather evidence for Clark's prosecution. On the contrary, it is clear that the first objective was to protect L.P.. At no point did the teachers inform L.P. that his answers would be used to arrest or punish his abuser. L.P. never hinted that he intended his statements to be used by the police or prosecutors. And the conversation between L.P. and his teachers was informal and spontaneous. The teachers asked L.P. about his injuries immediately upon discovering them, in the informal setting of a preschool lunchroom and classroom, and they did so precisely as any concerned citizen would talk to a child who might be the victim of abuse.

*Id.* at \_\_\_, 135 S. Ct. at 2181, 192 L. Ed. 2d at 316.

Yet the Court did not leave the analysis there. The Court stated that "L.P.'s age fortifies our conclusion that the statements in question were not testimonial. Statements by very young children will rarely, if ever, implicate the Confrontation Clause." *Id.* at \_\_\_, 135 S. Ct. at 2181–82, 192 L. Ed. 2d at 316. The Court commented that "it is extremely unlikely that a 3-year-old child in L.P.'s position would intend his statements to be a substitute for trial testimony." *Id.* at \_\_\_, 135 S. Ct. at 2182, 192 L. Ed. 2d at 316. Additionally, the Court emphasized that in the eighteenth century, out-of-court statements by children who were incompetent to testify due to their youth were regularly admitted in criminal cases. *Id.* at \_\_\_, 135 S. Ct. at 2182, 192 L. Ed. 2d at 316–17. Therefore, in the Court's view, "It is . . . highly doubtful that statements like L.P.'s ever would have been understood to raise Confrontation Clause concerns." *Id.* at \_\_\_, 135 S. Ct. at 2182, 192 L. Ed. 2d at 317. Also, the Court reiterated that the statements were made to teachers, not law enforcement officials:

> Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. It is common sense that the relationship between a student and his teacher is very different from that between a citizen and the police.

*Id.* (citation omitted). The Court concluded, "In light of these circumstances, the Sixth Amendment did not prohibit the State from introducing L.P.'s statements at trial." *Id.*

Based on the Supreme Court's opinion in *Clark,* we do not believe admission of Dr. Harre's testimony and report violated J.C.'s rights of confrontation under the Sixth Amendment. Several points must be noted. A.W. is a very young child, and the Supreme Court said in *Clark* that "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause." *Id.* at ___, 135 S. Ct. at 2182, 192 L. Ed. 2d at 316. The Court supported this statement with historical evidence including an approving citation to a law review article. *Id.* at ___, 135 S. Ct. at 2182, 192 L. Ed. 2d at 316–17 (citing Thomas D. Lyon & Raymond LaMagna, *The History of Children's Hearsay: From Old Bailey to Post-Davis,* 82 Ind. L.J. 1029 (2007) [hereinafter Lyon]). The article makes clear that in eighteenth century Britain, "the hearsay of unavailable child witnesses was routinely admitted." Lyon, 82 Ind. L.J. at 1030. Thus, A.W.'s age alone may settle the Sixth Amendment inquiry.[5]

---

[5]In his separate opinion concurring in the judgment, Justice Scalia gave primacy to the primary-purpose test. *Clark,* 576 U.S. at ___, 135 S. Ct. at 2184–85, 192 L. Ed. 2d at 319–20 (Scalia, J., concurring in the judgment). He explained,

> The Confrontation Clause categorically entitles a defendant *to be confronted with the witnesses against him*; and the primary-purpose test sorts out, among the many people who interact with the police informally, *who is acting as a witness and who is not.* Those who fall into the former category bear testimony, and are therefore acting as "witnesses," subject to the right of confrontation.

Also, A.W.'s statements were made to a physician, with no law enforcement representative in the room or even observing the encounter remotely. In *Clark*, the Supreme Court stressed "that the relationship between a student and teacher is very different from that between a citizen and the police." *Id.* at \_\_\_, 135 S. Ct. at 2182, 192 L. Ed. 2d at 317. The same is true of the relationship between a small child and physician.

Under a pure primary-purpose test, the issue would undoubtedly be closer—certainly closer than *Clark*.[6] Yet even here a number of

_____

*Id.* at \_\_\_, 135 S. Ct. at 2185, 192 L. Ed. 2d at 320. Justice Scalia concurred in the result because, in his view, the primary-purpose test had not been met. *Id.* at \_\_\_, 135 S. Ct. at 2184, 192 L. Ed. 2d at 318–19. He also criticized parts of the majority opinion going beyond the primary-purpose test as "dicta" that in his view were "not binding." *Id.* at \_\_\_, 135 S. Ct. at 2184, 192 L. Ed. 2d at 319.

The academic community is only just starting to weigh in on *Clark*. The only published law review article we have been able to find by a law professor—as opposed to a blog or a law student note—reviewed the Court's entire opinion and then concluded, "Which of these points was essential to the Court's conclusion that the Confrontation Clause did not apply was not obvious." David L. Noll, *Constitutional Evasion and the Confrontation Puzzle*, 56 B.C. L. Rev. 1899, 1917 n.158 (2015).

Furthermore, "[c]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) (alteration in original) (quoting *Doughty v. Underwriters at Lloyd's, London*, 6 F.3d 856, 861 n.3 (1st Cir. 1993)).

It also noteworthy that Justice Scalia—widely known as an originalist—did *not* reject the possibility that out-of-court statements by small children would be admissible today based on their admissibility at common law, even if they were deemed testimonial under the primary-purpose test. All he said was that once evidence is "testimonial," i.e., as determined under the primary-purpose test, the burden rests with the prosecutor "to prove a long-established practice" of introducing this category of evidence "for which cross-examination was not typically necessary." *Clark*, 576 U.S. at \_\_\_, 135 S. Ct. at 2185, 192 L. Ed. 2d at 320. Justice Scalia also cited the Lyon and LaMagna article with approval. *Id.* at \_\_\_, 135 S. Ct. at 2184, 192 L. Ed. 2d at 319. So it is entirely plausible that Justice Scalia would have agreed: Out-of-court statements by very young children who are not competent to testify do not raise Confrontation Clause concerns today because they did not raise admissibility concerns in the eighteenth century.

[6]For one thing, A.W.'s statements were not made "in the context of an ongoing emergency," but well after law enforcement had commenced their investigation. *Cf. Clark*, \_\_\_, U.S. at 135 S. Ct. at 2181, 192 L. Ed. 2d at 315.

factors weigh against a Confrontation Clause violation. The primary-purpose test asks whether the main purpose of the conversation was to "creat[e] an out-of-court substitute for trial testimony." *Id.* at ___, 135 S. Ct. at 2180, 192 L. Ed. 2d at 315 (alteration in original) (quoting *Bryant*, 562 U.S. at 358, 131 S. Ct. at 1155, 179 L. Ed. 2d at 107. At the outset, we need to ask, "Whose primary purpose?" A.W.'s or Dr. Harre's? The Court applied the primary-purpose test by considering the matter from the perspective of both interviewer and interviewee. *See id.* at ___, 135 S. Ct. at 2181, 192 L. Ed. 2d at 316 (noting that "the first objective was to protect L.P." and L.P. "never hinted that he intended his statements to be used by the police or prosecutors"). The Court also stressed that the conversation was "informal and spontaneous." *Id.*

Weighing all the circumstances here, and considering the role of both participants in the conversation, the following factors support a determination that the Confrontation Clause was not violated under the primary-purpose test: First, it is obvious that A.W.'s purpose was not to make a statement to Dr. Harre that could be used to prosecute J.C. Second, the setting was informal. Dr. Harre and A.W. met by themselves at Dr. Harre's office. Dr. Harre first asked A.W. to make letters on an easel board, and went over truth–lie differences. She then conducted a "medical review of systems," asking A.W. about areas of discomfort or signs of illness. After doing so, she asked A.W. if she could remember what happened with her brother's friend. Dr. Harre then conducted a full physical exam, at that point with A.W.'s father present. Dr. Harre took notes throughout the entire process, but no recording took place. Dr. Harre later dictated from her notes. The discussion of the incident with J.C. represented a single paragraph in the five-page report.

Third, while it appears that law enforcement made the original referral that led to Mattox's forensic interview in early July, any law enforcement role in arranging Dr. Harre's session with A.W. in late July would have been more attenuated. The two encounters took place three weeks apart, and Dr. Harre did not have access to the forensic interview when she examined and spoke with A.W. Furthermore, according to Dr. Harre, she receives referrals from "police department[s], [DHS], other physicians, therapists, [and] emergency rooms," and she performed the standard evaluation with A.W. that she would perform with "any other child."

To be fair, when we view the matter from Dr. Harre's perspective alone, the session likely served "two purposes"—analyzing A.W.'s medical condition and memorializing her story. *See State ex rel. Juv. Dep't of Multnomah Cty. v. S.P.,* 215 P.3d 847, 865 (Or. 2009) (en banc) (finding, pre-*Clark,* a Sixth Amendment violation when a three-year-old's statements during an interview with a child abuse response center were admitted at trial). Dr. Harre was providing medical assessment, but her report was addressed to the assistant county attorney who later prosecuted the case.

However, when we consider the totality of circumstances under the primary-purpose test, *as well as* the additional points emphasized by the Supreme Court in *Clark,* we find no Sixth Amendment violation. Several things distinguish this case from *Bentley* and the Oregon Supreme Court's decision in *S.P.* No law enforcement personnel attended or monitored Dr. Harre's session with A.W. *Cf. Bentley,* 739 N.W.2d at 297; *S.P.,* 215 P.3d at 860. In fact, a recorded forensic interview with law enforcement on site had already occurred when Dr. Harre met with A.W without law enforcement. Moreover, A.W. was considerably younger than

the ten-year-old victim in *Bentley*[7]—an important consideration according to the *Clark* Court.

Finally, and crucially, we cannot ignore the Supreme Court's pronouncement that "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause," as well as the Court's reliance on the historical record, which indicates that hearsay statements of child witnesses who were incompetent to testify were admitted at common law. *Clark*, 576 U.S. at ___, 135 S. Ct. at 2181–82, 192 L. Ed. 2d at 316–17.

Since J.C. does not urge us to apply a different approach under article I, section 10 of the Iowa Constitution, we decline to do so in this case. Thus, we find that admission of Dr. Harre's testimony and written report did not violate J.C.'s confrontation rights under either the Sixth Amendment or article I, section 10 of the Iowa Constitution.

Still, we close our discussion of Dr. Harre's interview with a few words of caution. Under a primary-purpose test, we do not believe an interview whose primary purpose is testimonial generally can be salvaged just because it is wedged inside a medical exam. The primary-purpose test applies to "the interrogation" that is at issue. *Id.* at ___, 135 S. Ct. at 2180, 192 L. Ed. 2d at 314. In addition, we do not believe that arranging a prior recorded forensic interview necessarily insulates a subsequent less-formal interview from attack under the Confrontation Clause. Lastly, as stated already, we jealously guard our authority to interpret the Iowa Constitution independently in a future case, particularly if a litigant argues such an interpretation in her or his briefing.

---

[7]We noted in *Bentley* that the victim functioned at a seven-year-old level, *see* 739 N.W.2d at 300, but this is still much older than A.W.'s chronological age or the level of her communication skills.

**B. Confrontation Clause—Mattox.** We now turn to whether the admission of Mattox's testimony violated J.C.'s Confrontation Clause rights. Despite A.W.'s very young age, we will assume without deciding that a violation occurred. Mattox's job title is "forensic interviewer." *See Bentley*, 739 N.W.2d at 299 (noting that the interview was described by a police officer as a "forensic interview"). Law enforcement made a referral call for Mattox's interview of A.W., and law enforcement was present when it occurred. The interview was recorded, and the recording was provided to the county attorney's office. *See id.* at 300 (noting that a copy of the tape was provided to police and marked as evidence).

Having said this, we agree with the court of appeals that any error was harmless. *See Kennedy*, 846 N.W.2d at 527 ("The erroneous admission of evidence in violation of the Confrontation Clause is a constitutional error subject to a harmless-error analysis."). To find a constitutional error harmless, "[w]e are required to ask whether the force of the evidence 'is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same' without the erroneously admitted evidence." *Id.* at 528 (quoting *Yates v. Evatt*, 500 U.S. 391, 405, 111 S. Ct. 1884, 1893, 114 L. Ed. 2d 432, 449 (1991)). In this context, harmless error means "no reasonable possibility that [the erroneously admitted] evidence might have contributed to the [adjudication]." *Id.* (quoting *State v. Hensley*, 534 N.W.2d 379, 383 (Iowa 1995)). The State bears the burden of establishing harmless error. *Id.* at 527.

Here, the other evidence against J.C. was quite strong. Unlike in many child abuse cases, there were other eyewitnesses to the act of abuse besides the victim—namely M.M., I.W., and E.W. As the juvenile court put it, "The eyewitness accounts alone are quite persuasive in this

case and appear credible due to the differences which are explained by the order they entered the room." Furthermore, as noted by the juvenile court, there was recorded evidence of J.C.'s "heightened interest in sexual activity on the date in question." J.C.'s testimony that he was trying to get A.W. out of the room was contradicted by the eyewitnesses; furthermore, J.C. had no explanation for the cell phone recording. And Dr. Harre's testimony and report provided further confirmation that an assault with intent to commit sexual abuse had occurred. In short, the remaining evidence was so strong that we see no reasonable possibility Mattox's testimony might have contributed to the adjudication. *See id.* at 528.

**C. Competency of A.W.** J.C. also challenges the admission of A.W.'s out-of-court statements to Dr. Harre on the basis that A.W. was incompetent to testify herself and, thus, Dr. Harre should not have been allowed to testify regarding A.W.'s statements. We will assume for the purposes of this analysis that A.W. was incompetent to testify. We have not previously addressed whether out-of-court statements made by incompetent witnesses may be admissible under exceptions to the hearsay rule.

Dr. Harre's testimony and her report of her interview with A.W. were admitted under Iowa Rule of Evidence 5.803(4) as statements made for the purpose of obtaining medical diagnosis or treatment. Significantly, J.C. does not appeal that ruling. Also, in *Clark*, the United States Supreme Court implicitly rejected the argument that a child's incompetence to appear as a trial witness foreclosed the admission of that same child's out-of-court statements:

> Clark is also wrong to suggest that admitting L.P.'s statements would be fundamentally unfair given that Ohio law does not allow incompetent children to testify. In any

> Confrontation Clause case, the individual who provided the out-of-court statement is not available as an in-court witness, but the testimony is admissible under an exception to the hearsay rules and is probative of the defendant's guilt. The fact that the witness is unavailable because of a different rule of evidence does not change our analysis.

*Clark*, 576 U.S. at ___, 135 S. Ct. at 2183, 192 L. Ed. 2d at 318. In addition, the Supreme Court has rejected the argument that an incompetent declarant's out-of-court statements are "presumptively unreliable." *Idaho v. Wright*, 497 U.S. 805, 824, 110 S. Ct. 3139, 3151, 111 L. Ed. 2d 638, 658 (1990).

Other courts have reached similar conclusions. *See Morgan v. Foretich*, 846 F.2d 941, 949 (4th Cir. 1988) ("The fact that a young child may be incompetent to testify at trial affects neither prong of the two-part test for admitting evidence under 803(4)."); *Borchgrevink v. State*, 239 P.3d 410, 423 (Alaska Ct. App. 2010) ("[C]ourts have admitted hearsay under this exception even when the person who made the out-of-court statement was incompetent to testify."), *overruled on other grounds by Moreno v. State*, 341 P.3d 1134 (Alaska 2015); *State v. Waddell*, 504 S.E.2d 84, 90 (N.C. Ct. App. 1998) (rejecting the argument that the child's incompetence rendered his out-of-court statements for purposes of medical diagnosis or treatment inadmissible); *State v. Muttart*, 875 N.E.2d 944, 954 (Ohio 2007) ("[R]egardless of whether a child less than ten years old has been determined to be competent to testify . . . , the child's statements may be admitted at trial as an exception to the hearsay rule pursuant to [rule] 803(4) if they were made for purposes of medical diagnosis or treatment."). *But see B.B. v. Commonwealth*, 226 S.W.3d 47, 51 (Ky. 2007) (holding that a child victim's out-of-court statements should have been excluded because "the immaturity that

rendered her incompetent at trial would have existed at the time of the interview as well").  As one treatise has said,

> Out-of-court statements for purposes of medical diagnosis or treatment may in some instances be admissible despite lack of testimonial competence when the statement was made.  Statements for purposes of diagnosis or treatment are considered reliable because the patient has an incentive to be truthful with the physician.  A child who lacks one or more elements of testimonial competence may nevertheless possess the incentive required by the diagnosis or treatment exception.

John E.B. Myers, *Myers on Evidence of Interpersonal Violence, Child Maltreatment, Intimate Partner Violence, Rape, Stalking, and Elder Abuse* § 7.20 (2016) (footnote omitted).

We affirm the juvenile court's ruling that A.W.'s incompetence to testify at trial did not render Dr. Harre's testimony and report per se inadmissible.

**IV.  Conclusion.**

For the foregoing reasons, we affirm J.C.'s adjudication.

**DECISION OF COURT OF APPEALS AFFIRMED AND JUVENILE COURT JUDGMENT AFFIRMED.**

All justices concur except Cady, C.J., who concurs specially, and Wiggins, J., and Hecht and Appel, JJ., who dissent.

**CADY, Chief Justice (concurring specially).**

I join in the opinion of the majority, but would not place weight on the eighteenth century practice of admitting statements of very young children. I otherwise agree the totality of the circumstances supports the conclusion that the primary purpose of the interview by Dr. Harre was not testimonial.

**WIGGINS, Justice (dissenting).**

I dissent. I disagree with the majority opinion's analysis concerning the significance of A.W.'s age in determining whether the introduction of her statements violated J.C.'s rights under the Confrontation Clause contained in the Sixth Amendment to the United States Constitution. Additionally, I disagree with the conclusion reached in the majority opinion and the special concurrence as to the primary purpose of A.W.'s statements. Because the primary-purpose test requires a court to consider the purposes of *all* participants involved in eliciting a statement as part of the totality of the circumstances, it is evident that A.W.'s statements were testimonial.

*Ohio v. Clark* is the only case in which the United States Supreme Court has addressed whether statements a victim made to someone other than a law enforcement officer may violate the Confrontation Clause. 576 U.S. ___, ___, 135 S. Ct. 2173, 2180, 192 L. Ed. 2d 306, 314–15 (2015). In *Clark*, the Court recognized "at least some statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns." *Id.* at ___, 135 S. Ct. at 2181, 192 L. Ed. 2d at 315. The Court also affirmed that determinations as to whether such statements are testimonial turn on the primary-purpose test. *Id.*

The primary-purpose test requires a court to determine "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Id.* at ___, 135 S. Ct. at 2180, 192 L. Ed. 2d at 315 (quoting *Michigan v. Bryant,* 562 U.S. 344, 358, 131 S. Ct. 1143, 1155, 179 L. Ed. 2d 93, 107 (2011)). As the Court has previously explained,

> [T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.

*Bryant,* 562 U.S. at 360, 131 S. Ct. at 1156, 179 L. Ed. 2d at 108–09.

The primary-purpose determination demands objective analysis of the circumstances of the encounter and the statements and actions of both interviewer and interviewee. *See id.* at 360, 131 S. Ct. at 1156, 179 L. Ed. 2d at 108. In other words, a court must look to the totality of the circumstances and consider the purposes of all participants involved in obtaining a statement when deciding whether a statement's primary purpose was testimonial.

The *Clark* Court made two additional observations concerning application of the primary-purpose test. First, statements made to persons who are "not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Clark,* 576 U.S. at \_\_\_, 135 S. Ct. at 2182, 192 L. Ed. 2d at 317. Second, a very young child who is being abused is "extremely unlikely . . . [to] intend his statements to be a substitute for trial testimony." *Id.* at \_\_\_, 135 S. Ct. at 2182, 192 L. Ed. 2d at 316.

I agree with most of the majority opinion's analysis of *Clark.* However, the majority opinion essentially reads *Clark* as holding statements by very young children never implicate the Confrontation Clause, unless (perhaps) such statements were made to or in the presence of a law enforcement officer.[8] The *Clark* Court stopped far

---

[8]When no single rationale explaining the result enjoys the assent of a majority of the Justices sitting, the holding of a fragmented court is the position taken by the

short of adopting such a rule. The age of the three-year-old child, L.P., who made the statements at issue in *Clark* merely "fortified" the Court's conclusion that the statements he made were nontestimonial insofar as his youth made it "extremely unlikely" he intended those statements to serve as a substitute for trial testimony. *Id.* at ___, 135 S. Ct. at 2181–82, 192 L. Ed. 2d at 316. Although the Court acknowledged it was doubtful statements a three-year-old child made to his teachers would have been understood to raise confrontation concerns at the time of the founding, the Court concluded the statements at issue were nontestimonial by relying on the primary-purpose test. *Id.* at ___, 135 S. Ct. at 2181–82, 192 L. Ed. 2d at 315–16; *see id.* at ___, 135 S. Ct. at 2184–85, 192 L. Ed. 2d at 319–20 (Scalia, J., concurring in the judgment) (discussing the majority holding and pointing out that the burden is upon the prosecutor who seeks to introduce testimonial evidence despite the Confrontation Clause "to prove a long-established practice of introducing *specific* kinds of evidence, such as dying declarations, for which cross-examination was not typically necessary" (citation omitted)).

The *Clark* Court acknowledged the existence of "strong evidence that statements made *in circumstances similar to those facing L.P. and his teachers* were admissible at common law" and indicated it is "thus highly doubtful that statements like L.P.'s ever would have been understood to raise Confrontation Clause concerns." *Id.* at ___, 135 S. Ct. at 2182, 192 L. Ed. 2d at 316–17 (majority opinion) (emphasis added). However, the

_____

Justices who concurred in the decision on the narrowest grounds. *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993, 51 L. Ed. 2d 260, 266 (1977).

Court in no way suggested historical evidence was critical to its holding, let alone adopted a categorical rule that statements made by very young children do not raise confrontation concerns.

For this reason, most legal scholars to consider *Clark* thus far have recognized as dictum the language in *Clark* suggesting the fact that an out-of-court statement's primary purpose was testimonial as "necessary, but not always sufficient" for its exclusion under the Confrontation Clause. *See* Richard D. Friedman, Ohio v. Clark: *Some Initial Thoughts*, The Confrontation Blog (June 19, 2015, 1:09 AM), http://confrontationright.blogspot.com/2015/06/ohio-v-clark-some-initial-thoughts.html (acknowledging the "necessary but not always sufficient" language as "potentially dangerous" dictum); Paul F. Rothstein, *A Comment on the Supreme Court's Decision in* Ohio v. Clark*: The Court's Confrontation Clause Jurisprudence Evolves* (2015), http://ssrn.com/abstract=2627748 (noting *Clark* provides an "escape hatch for future cases—one that is clearly dictum"); *see also* Chad Squitieri, Note, *Confronting Big Data: Applying the Confrontation Clause to Government Data Collection*, 101 Va. L. Rev. 2011, 2022 n.71 (2015) (describing the "necessary, but not always sufficient" language as dictum). Justice Scalia, joined by Justice Ginsburg in an opinion concurring in the result, agreed. *Clark*, 576 U.S. at ___, 135 S. Ct. at 2184–85, 192 L. Ed. 2d at 318–20 (Scalia, J., concurring in the judgment).

In my view, the majority opinion rests on an expansive reading of dictum in *Clark* to adopt the very rule the *Clark* majority refused to adopt. Simply put, the *Clark* majority declined to hold that statements made by very young children or statements made to individuals other than law enforcement officers *never* implicate the Confrontation Clause.

Rather, as the *Clark* majority explained, "Courts must evaluate challenged statements in context, and part of that context is the questioner's identity." *Id.* at ___, 135 S. Ct. at 2182, 192 L. Ed. 2d at 317 (majority opinion).

Of course, the analysis in *Clark* concerning whether the statements at issue in that case were testimonial is instructive. Because the three-year-old child who made those statements was so young, in applying the primary-purpose test the Court focused on the objective circumstances indicating the purpose his teachers had in eliciting them. *Id.* at ___, 135 S. Ct. at 2181, 192 L. Ed. 2d at 315–16. The Court concluded the statements were nontestimonial because his teachers were responding to an "ongoing emergency involving suspected child abuse" and sought to "protect the victim from future attacks." *Id.* In short, there was simply "no indication that the primary purpose of the conversation was to gather evidence for Clark's prosecution" given that the conversation between the child and his teachers was "informal and spontaneous." *Id.* at ___, 135 S. Ct. at 2181, 192 L. Ed. 2d at 316.

In applying the primary-purpose test, it is important to consider objectively all the circumstances surrounding the statements at issue, not just those suggesting the statements were nontestimonial. Here, two objective circumstances weigh in favor of the conclusion that A.W.'s statements were nontestimonial. First, Dr. Harre is not a police officer. Second, A.W. was only four-and-a-half-years old when she made the statements to Dr. Harre.

On the other side of the scale are several circumstances suggesting "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Id.* at ___, 135 S. Ct. at 2180, 192 L. Ed. 2d at 315

(quoting *Bryant*, 562 U.S. at 358, 131 S. Ct. at 1155, 179 L. Ed. 2d at 107). In contrast to *Clark*, there was ample circumstantial evidence to suggest the purpose of the individuals who elicited the statement at issue was to create an out-of-court substitute for trial testimony and virtually no evidence to suggest they had any other purpose.

First, it is clear law enforcement instructed A.W.'s parents to take her to Dr. Harre's office. Detective Robinson testified as follows:

> Q. When did you first become involved with the [J.C.] case? A. I don't remember the exact date, but it was assigned to me at a certain time. That's when and how I became involved in it.
>
> Q. Do you know if the family of [the victim] made initial contact with you or did they make initial contact with another officer? A. They made initial contact with the front desk of our police department and filed a report there.
>
> Q. And when was it assigned to you? A. I do not know off the top of my head.
>
> Q. But would it have been shortly after they made contact? A. Yes. Yes, within a couple days.
>
> Q. And what's sort of the standard procedure for investigating this type of case? A. Usually, after I receive the initial case, I'll read the report and find out who I have involved in that investigation, and we'll call each one in as a witness.
>
> With this particular case having a victim, especially a young victim, I got ahold of her mother and father and had them take her down to the Child Protection Center where Dr. Harre's office is to be examined by her, and also specifically interviewed by Michele Mattox, who is a child forensic interviewer through that same department as well.
>
> Q. And did you interview the other children involved in this situation? A. I did.

Thus, Detective Robinson testified he sought to have Dr. Harre's office perform the investigative task of interviewing A.W. because she was so

young. In contrast, Detective Robinson interviewed the older children present at the time of the alleged delinquent act himself. Moreover, as his testimony makes clear, Detective Robinson instructed A.W.'s parents to take her to Dr. Harre because doing so was part of the Davenport Police Department's "standard operating procedure for investigating this type of case."

The fact that the Davenport Police Department regularly utilizes Dr. Harre's office to interview young children who are suspected victims of abuse suggests Dr. Harre's office acts on behalf of the police in conducting such interviews. The Code actively encourages the police and others involved in prosecuting suspected child abuse to work cooperatively with medical and mental health professionals such as Dr. Harre to conduct child abuse investigations and make child abuse assessments. The Code provides,

> 4. *a.* A child protection assistance team involving the county attorney, law enforcement personnel, and personnel of the department of human services shall be established for each county by the county attorney. However, by mutual agreement, two or more county attorneys may establish a single child protection assistance team to cover a multicounty area. A child protection assistance team, to the greatest extent possible, may be consulted in cases involving a forcible felony against a child who is less than age fourteen in which the suspected offender is the person responsible for the care of a child, as defined in section 232.68. A child protection assistance team may also be utilized in cases involving a violation of chapter 709 or 726 or other crime committed upon a victim as defined in subsection 1.
>
> *b.* A child protection assistance team may also consult with or include juvenile court officers, medical and mental health professionals, physicians or other hospital-based health professionals, court-appointed special advocates, guardians ad litem, and members of a multidisciplinary team created by the department of human services for child abuse investigations. A child protection assistance team may work cooperatively with the early childhood Iowa area board

established under chapter 256I. The child protection assistance team shall work with the department of human services in accordance with section 232.71B, subsection 3, in developing the protocols for prioritizing the actions taken in response to child abuse assessments and for law enforcement agencies working jointly with the department at the local level in processes for child abuse assessments. The department of justice may provide training and other assistance to support the activities of a child protection assistance team.

Iowa Code § 915.35(4)(*a*)–(*b*) (2015).

Second, the evidence confirms the forensic interviewer also referred A.W. to Dr. Harre's office. As the majority points out, Dr. Harre testified that A.W. was referred to her by the emergency room that saw A.W. on July 3, 2013. However, Dr. Harre stated in her report that A.W. was referred to the *center* by the emergency room. Dr. Harre indicated in the second sentence of her report that A.W. was referred to her office by the forensic interviewer. Moreover, as the majority opinion acknowledges, the forensic interviewer only got involved in the investigation after the police "made a referral call."

The further significance of the fact that the forensic interviewer also referred A.W. to Dr. Harre lies in Dr. Harre's recognition that the forensic interviewer's primary concern is investigative, not diagnostic or therapeutic. Dr. Harre testified as follows concerning the role of the forensic interviewer in child abuse investigations:

> Q. And is the forensic interview helpful in pursuing a diagnosis and treatment for the child? A. It's helpful in the investigative aspect. Michele does—if she does recognize that there are concerns that would benefit from a medical assessment, she will indicate that she definitively thinks that a medical assessment should be included in the process to the investigative team and to the family.

If the purpose of referring a child for a medical assessment is purely diagnostic or therapeutic, there would be no need for the forensic interviewer to alert "the investigative team" of anything.

Third, the timing of the conversation between Dr. Harre and A.W. and the information available to Dr. Harre before that conversation took place suggests her primary concern was not diagnostic or therapeutic. If the purpose of Dr. Harre's conversation with A.W. was diagnostic or therapeutic, common sense suggests Dr. Harre would have sought, or the forensic interviewer would have provided, a copy of the forensic interviewer's report or a copy of the recorded interview *before* Dr. Harre met with A.W. Yet Dr. Harre testified she had no knowledge of the statements A.W. made to the forensic interviewer prior to speaking with A.W.:

> Q. What information were you provided—let me rephrase that. Were you provided a copy or information regarding Michele Mattox's interview of the child prior to your interview? A. No.

> Q. So you weren't familiar at the time of the interview with any of the statements that were made by [A.W.] to Michele Mattox? A. Correct.

The fact that Dr. Harre remained unfamiliar with the content of the forensic interview is particularly conspicuous in light of the surrounding circumstances. Dr. Harre and the forensic interviewer both work at the Child Protection Response Center. Thus, when Dr. Harre examined A.W., she had available to her a complete account of what happened to A.W. in her own words prepared by someone who worked in the very same office. The forensic interviewer recorded her interview with A.W. on July 10. Dr. Harre met with A.W. on July 31, three weeks after the

forensic interviewer conducted the interview and forwarded her notes to law enforcement.

Similarly, the delay that occurred between the alleged delinquent act on July 2 and the conversation between Dr. Harre and A.W. suggests the purpose of that conversation was not diagnostic or therapeutic. If Dr. Harre's purpose had been to assess whether A.W. required medical or mental health treatment due to the alleged delinquent act, it seems unlikely that Dr. Harre would have assessed A.W. on July 31, nearly a full month after J.C. allegedly committed the delinquent act.

Fourth, Dr. Harre sent her report to the county attorney's office. This fact weighs significantly in favor of concluding the statements at issue were testimonial because it confirms that Dr. Harre understood herself to be cooperating with law enforcement in the investigation of the allegations against J.C. In fact, Dr. Harre not only sent the report to the *office* charged with prosecuting the alleged delinquent act, she also addressed it to the very *individual* responsible for prosecuting J.C. This fact belies any claim that Dr. Harre did not have a primary purpose of assisting law enforcement in prosecuting J.C.

Finally, the circumstances existing when the conversation between Dr. Harre and A.W. occurred are unlike those the Supreme Court relied upon to conclude the statements in *Clark* were nontestimonial. Notably, Dr. Harre interviewed and examined A.W. long after the police department had opened an investigation into the alleged delinquent act. In *Clark*, the victim made statements to his teachers prior to the initiation of any investigation. 576 U.S. at ___, 135 S. Ct. at 2178, 192 L. Ed. 2d at 312.

Furthermore, because Dr. Harre and A.W. spoke nearly a month after the alleged delinquent act occurred, the statements A.W. made

during that conversation were neither made nor elicited "in the context of an ongoing emergency" in which "the immediate concern was to protect a vulnerable child" from the threat of future abuse. *Id.* at ___, 135 S. Ct. at 2181, 192 L. Ed. 2d at 315–16. There is no evidence to suggest Dr. Harre's questions "were primarily aimed at identifying and ending the threat" to A.W. in order to protect her from immediate harm. *Id.* at ___, 135 S. Ct. at 2181, 192 L. Ed. 2d at 316.

Additionally, the conversation between Dr. Harre and A.W. was far from spontaneous or informal. *Cf. id.* A.W. made the statements at issue in response to questions posed to her by an unfamiliar person in an unfamiliar setting. Dr. Harre is not a teacher or primary care physician who had a preexisting relationship with A.W. Dr. Harre's office is not a preschool classroom where A.W. was accustomed to spending time. Though the conversation with Dr. Harre was unlike a formal interrogation in that a law enforcement officer was not present, it was not entirely informal. For example, Dr. Harre discussed the concept of truthfulness with A.W. near the start of their conversation.

As the majority opinion points out, A.W. was very young when she made the statements at issue in this case, and she made them outside the presence of the police or the prosecutors charged with prosecuting the case. I also agree with the majority opinion's conclusion A.W. certainly did not make the statements with the intent that they be used to prosecute J.C. However, nothing in *Clark* suggests these facts are adequate to decide this case. On the contrary, *Clark* acknowledges the primary-purpose test is a necessary component of the analysis when a defendant raises a confrontation challenge to determine whether the statement at issue was testimonial or not. *Id.* at ___, 135 S. Ct. at 2180–81, 192 L. Ed. 2d at 315.

In contrast to *Clark*, the facts of this case suggest the primary purpose of the conversation between Dr. Harre and A.W. was to obtain statements from A.W. that the county attorney could introduce in court. The primary purpose of Dr. Harre's conversation with A.W. was to gather evidence to be supplied to the very individual tasked with prosecuting J.C. The evidence indicates Dr. Harre understood herself to be cooperating with law enforcement in their investigative efforts. Law enforcement regularly relied upon her office as a tool in those efforts as part of its standard operating procedure. Had the police department anticipated the information Dr. Harre obtained would not be made available for use in its investigation, surely at least one of the officers within the department would have interviewed A.W. Though A.W. does not speak clearly, she was able to communicate effectively to Dr. Harre and the forensic investigator. There is no reason to believe she would have been unable to communicate during an interview with a police officer, or before the court in a juvenile proceeding, if appropriate safeguards were in place.

Accordingly, because the totality of the circumstances indicate the conversation during which A.W. made the statements contained in Dr. Harre's report and testimony was intended to generate a substitute for trial testimony, I conclude those statements were testimonial. Police officers cannot enlist third parties to act on their behalf in order to gather statements to be used in court and later claim the statements were nontestimonial.

For the same reason, I conclude the statements contained in Michelle Mattox's report and testimony were testimonial. As the majority opinion acknowledges, Mattox conducted a forensic interview of A.W. after police "made a referral call, and law enforcement was present when

it occurred." Additionally, Mattox recorded the interview and provided a copy of the recording to the county attorney's office. Mattox also sent a copy of the report she generated after the interview to both the assistant county attorney in charge of prosecuting J.C. and the detective assigned to investigate him. In short, the evidence indicates Mattox intentionally played an investigative role in the law enforcement investigation into the alleged delinquent act.

For these reasons, I would reverse the finding of delinquency and remand the case for a new hearing.

Hecht and Appel, JJ., join this dissent.